## McDERMETT v. UNITED STATES.
### No. 1351.

Municipal Court of Appeals for the District of Columbia.

Argued June 22, 1953.

Decided July 14, 1953.

Edward T. Kehoe, Washington, D. C., with whom Evan T. Davis, Washington, D. C., was on the brief, for appellant.

Samuel J. L'Hommedieu, Jr., Asst. U. S. Atty., Washington, D. C., with whom Leo A. Rover, U. S. Atty., William R. Glenlon, William J. Peck and E. Riley Casey, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before CAYTON, Chief Judge, and HOOD and QUINN, Associate Judges.

CAYTON, Chief Judge.

By information filed in the trial court defendant was charged with assault.[1] He was convicted on the testimony of a police officer named Klopfer who said that simultaneously with an invitation to a homosexual act defendant put his hand on the officer's genital organ. The question before us is whether under the facts as presented at the trial the conviction can be permitted to stand.

Quite recently we had occasion to review a conviction of a charge of assault, in connection with which the defendant was said to have expressed a homosexual purpose. Dyson v. United States, D.C.Mun.App., 97 A.2d 135.[2] There the defendant approached a police officer on a public street in the nighttime and asked the officer to light his cigarette. The officer handed him a book of matches, and immediately after defendant had lit the cigarette and returned the matches he reached out and squeezed the officer's genitalia. We based our decision largely on Beausoliel v. United States, 71 App.D.C. 111, 107 F.2d 292, 296, where the court said that the offense contemplated by the statute is a common law assault and, directing its attention specifically to cases involving sex aberrations, said: "At common law, it was generally held that a man who took improper liberties with the person of a female, without her consent, was guilty of assault * * *.

1. Code 1951, § 22–504: "Whoever unlawfully assaults, or threatens another in a menacing manner, shall be fined not more than five hundred dollars or be imprisoned not more than twelve months, or both."

2. That case is now pending on petition to the U. S. Court of Appeals, for allowance of appeal. (ADDENDUM as of July 31, 1953: The petition for allowance of appeal was this day denied by the U. S. Court of Appeals, in its No. 11,832.)

The attempt need not be made violently, insolently, or in anger. Such assaults are not made in that way." Relying on the reasoning of that decision we said: "If it is an assault to touch a woman unlawfully in the expression of a lustful instinct, then surely it is just as much an assault for one man to fondle another *without his consent* in the intimate expression of a perverted desire." (Emphasis supplied.) We stated our conclusion thus: "So, applying the common law rule and paraphrasing only slightly what the court there said, we rule that a man who takes improper liberties with the person of another man *without his consent* is guilty of assault." (Emphasis added.)

It will be seen that the three emphasized words, "without his consent," provided an essential basis for our ruling. And we did not fail to observe that if the man so touched or fondled were himself a deviate and responded favorably to the approach, "such response would of course constitute consent and nullify the offense."

It may of course be assumed that the arresting officer in this case was not a deviate. But the question is whether his conduct was so responsive toward defendant's overtures as to indicate consent. To answer that question the evidence must be examined in some detail. Such examination has satisfied us that the facts here are greatly different from those in the Dyson case.

There the defendant asked and received a light and immediately afterward, with no intervening conversation, applied the pressure of his hand to the officer's body. There could not have been the slightest basis in that case for saying that the officer consented. Here a series of events lasting upwards of 40 minutes pointed to consent. When Officer Klopfer first saw defendant, in the men's room of a moving picture theater, he was engaged in an act of onanism. Klopfer did nothing about it and defendant stopped of his own accord when several other people came into the room. Defendant then engaged Klopfer in conversation about the moving picture which was showing in the theater; then Klopfer left and stood in front of the theater and defendant also came out and walked past the officer and stood in front of a nearby store; then Klopfer followed in the same direction and defendant resumed the conversation remarking, "that there wasn't much doing in Washington," to which Klopfer agreed. They also talked about defendant having been in the Canadian Army (he was wearing a Canadian Army jacket with emblems of that army on it); they also talked about the weather. During that time they continued to walk together, circling three city blocks and covering a total of seven blocks. During the walk defendant once stepped into a doorway and Klopfer stepped in with him and there, he said, they continued their conversation about the weather. During the conversation Klopfer said he was from South Carolina, which was not true, and that he was staying at the Annapolis Hotel, which was also not true. Klopfer admitted that he "kind of thought" defendant was a homosexual by reason of what he had seen at the theater and that when they came to the Annapolis Hotel defendant was still walking along with him or behind him and Klopfer walked into the men's room on the first floor of the hotel. Though he said sex had not previously been discussed during the conversation Klopfer testified, "I wanted to see what he was up to." Being asked on cross-examination why he didn't stay in the lobby or go upstairs to his room he answered: "I knew he was beside me. I just wanted to find out exactly what he had in mind, in view of his conversation, if anything." Klopfer then stood in front of a urinal and defendant walked up next to him, again commenced to masturbate and then did the touching above described and suggested to Klopfer an act of sodomy. Klopfer asked, "where can we go?" to which defendant suggested that they go up to Klopfer's room. Then it was that Klopfer displayed his badge, revealed his true identity and placed defendant under arrest. Klopfer was in part corroborated by another police officer who had followed the two men and said he saw them walking together on the street and talking together. He said he was outside the men's room at the hotel

when he heard some scuffling and helped Klopfer subdue the defendant who was refusing to submit to the arrest. According to both officers, defendant after the arrest admitted the touching and also admitted having engaged in prior homosexual acts for about five months.

 It is a fundamental policy of the law, as stated by Judge Sanborn in the leading case of Butts v. United States, 8 Cir., 273 F. 35, 38, 18 A.L.R. 143, that: "The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it." (Cited with approval in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413.)

It seems plain that the officer in this case had an entirely different purpose in mind. When he first saw defendant in the men's room of the theater he did nothing to stop his act of onanism. He did not arrest him;[3] instead he engaged in conversation with defendant, apparently waited for him in front of the theater, and after defendant had walked past him, followed defendant down the street where the conversation was resumed. Although he said the conversation did not involve sex the defendant might reasonably have believed that Klopfer not only was not shocked by what he saw but was interested in developing their acquaintance further and that for that purpose Klopfer took the seven block stroll with him. When they came to the hotel where Klopfer had told defendant he was staying he did not say good-night and start for the elevator to go to his supposed room. Instead, because in his own words he wanted to see what defendant "was up to" and "wanted to find out exactly what he had in mind," he led the way (this we think is a fair statement) to the men's room and exposed himself in front of a urinal; then it was that defendant revealed his desire to engage in an act of perversion. This desire was made known by verbal suggestion and by the physical gesture we have described.

The evidence would probably have supported a charge of soliciting for immoral or lewd purposes under D.C.Code 1951, 22–2701. Indeed we have sustained a conviction of such a charge on evidence strikingly similar to that in this case.[4] But it by no means follows that the same evidence will always or necessarily support a charge of assault.

 Returning to what we said in the Dyson opinion, a case of assault can be made out only when the complaining witness *has not consented*. Such lack of consent cannot be found in the testimony in this case. Klopfer had already observed defendant a short while before in a state of self-induced sexual excitement, engaging in an act constituting disorderly conduct. It is reasonable to ask why he allowed himself to be "picked up" (we take the words from the transcript) and why he encouraged, or at least permitted, the acquaintance to develop on a more personal basis? Let us suppose that a woman was charging a man with assault and that in the essentials the evidence was similar to this. Let us suppose that the woman had witnessed a defendant in a similar excited state and instead of immediately complaining against him or withdrawing from his presence, she entered into a conversation with him, went for a walk with him and permitted him to follow her to a place of privacy or seclusion and that he then touched her in an intimate way. Would not reason and fair play furnish the answer and say that the woman had by conduct and suggestion given her consent to the touching?[5]

 Or let us suppose that a man other than a police officer were the complainant.

---

3. The D.C.Code 1951, § 4–143 makes it a misdemeanor for a policeman to fail to arrest for an offense committed in his presence.

4. See Bicksler v. United States, D.C.Mun. App., 90 A.2d 233, where we held that the requirements prescribed in Kelly v. United States, 90 U.S.App.D.C. 125, 194 F.2d 150, including corroboration of the circumstances, had been met.

5. See State v. Nelson, 232 N.C. 602, 61 S. E.2d 626; Cf. Alexander v. Blodgett, 44 Vt. 476.

On all the evidence would it not have to be said that his course of cooperative conduct with the defendant was such that he could not be heard to say that he had been assaulted? Courts are not so uninformed as not to be aware that there are such things as flirtations between man and man. And when flirtation is encouraged and mutual, and leads to a not unexpected intimacy or an intimacy not discouraged or repelled, such cannot be classified as an assault. Even more strongly should the rule apply when the complaining witness is a policeman. An officer of the law, as we have said, has the duty of preventing, not encouraging crime. As appellant's counsel says in his brief, an officer should not be permitted to "torment and tease weak men beyond their power to resist" and then attempt to make out a case of assault.

We do not say that the police officer was guilty of entrapment. But the evidence may be tested as if entrapment were claimed.[6] In a case like this, involving a crime against the person, it is necessary to inquire whether there was consent because the want of consent of the person affected is a necessary element of the crime.[7] When it appears that "the person affected"—the police officer—has by his own insidious conduct, by patient and clever encouragement, and by setting the stage for a furtive homosexual gesture, placed himself in the position of consenting, he should not be heard to say of the accused, "He assaulted me."

Reversed.

HOOD, Associate Judge (concurring).

I agree that the conviction should be reversed, but I do not agree that there is any great difference between this case and the Dyson case.[1] This is just another case of charging a defendant with assault and convicting him on proof of homosexuality. The main difference between this case and the Dyson case is that this is a more flagrant example of an attempted evasion of the Kelly case.[2]

6. By reason and analogy it may be said that the general principle of estoppel, involved in the defense of entrapment, should apply. As this court said several years ago, "The defense of entrapment is drawn by analogy from the equitable doctrine of estoppel." Sherman v. United States, D.C.Mun.App., 36 A.2d 556, 563. The thought was more fully developed in the concurring opinion in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 217, 77 L.Ed. 413, in this language: "Always the courts refuse their aid in civil cases to the perpetration and consummation of an illegal scheme. Invariably they hold a civil action must be abated if its basis is violation of the decencies of life, disregard of the rules, statutory or common law, which formulate the ethics of men's relations to each other * * *. The doctrine of entrapment in criminal law is the analogue of the same rule applied in civil proceedings."

7. See 18 A.L.R. 149; 66 A.L.R. 482; 86 A.L.R. 265.

1. Dyson v. United States, D.C.Mun.App., 97 A.2d 135.

2. Kelly v. United States, 90 U.S.App.D.C. 125, 194 F.2d 150.