**Peter K. CHACONAS, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 6365.**

District of Columbia Court of Appeals.

Argued June 20, 1973.

Decided Oct. 16, 1974.

---

31.  Formal Case No. 567, Order No. 5571 at 4, Mar. 28, 1973.

Warren E. Magee, Washington, D. C., for appellant.

John C. Lenahan, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed, John A. Terry, John O'B. Clarke, Jr., and John E. Drury, Asst. U. S. Attys., were on the brief, for appellee.

Before REILLY, Chief Judge, and PAIR and YEAGLEY, Associate Judges.

YEAGLEY, Associate Judge:

This appeal is from convictions on counts of (1) arson[1] and (2) malicious burning of one's own property with intent to defraud,[2] in a trial without a jury. Appellant asserts that the trial court erred: in overruling his motion to suppress certain evidence taken from the scene of the fire, in denying his motion for a judgment of acquittal at the conclusion of the prosecution's case in chief, and in holding that the evidence on each count was sufficient to establish his guilt beyond a reasonable doubt. Upon consideration of the briefs and argument of counsel and after a careful review of the record we affirm.

The charges arose out of a fire that occurred about 2:45 a. m., February 24, 1971, at 2147 Pennsylvania Avenue, N. W., in premises rented by a corporation owned and operated by appellant and transacting business as the Tom Jones Res-taurant. The only witness called by appellant to testify in support of the motion to suppress was Inspector George I. Meyer, an investigator of the Fire Investigation Section of the Metropolitan Fire Department. He testified that he began his investigation of the fire about 8:45 a. m. the day of the fire after receiving orders to continue a preliminary investigation initiated by Inspector Spedden shortly after the fire was extinguished, earlier that same morning. He was assisted by another inspector who is a registered master electrician. When Inspector Meyer arrived on the scene, he advised appellant of his purpose and asked him to unlock the door to the restaurant. The appellant did so without voicing any objection to their entry and was present throughout their inspection.

Upon looking about the burned area to determine the pattern and course of the fire they noticed that "there was a distinct coning against the west wall". After discussing the possibility of faulty electrical wiring they directed their attention to an electrical receptacle in the floor in the center of the room. The assistant removed the cover and pulled some of the wiring out of the metal box together with some debris which the witness said had the odor of gasoline. Further inspection of the box revealed the presence of a "definite oily base substance" which also had the odor of gasoline. They removed the box for a laboratory analysis and, upon inquiry, were told by appellant that he had no objection to their taking it. They also removed part of the scorched rug and the pad underneath, a piece of fibrous material from a chair and a piece of wall framing from the west wall. Earlier, Inspector Spedden had removed a charred match book and cover from the scene of the fire, which together with an intact match book and cover, were lost after a photograph was taken of them. The motion to suppress was directed at all

---

1. D.C.Code 1973, § 22–401. The property was a building owned by Group Health Association, Inc.

2. D.C.Code 1973, § 22–402. The property was goods, wares, and merchandise owned by a corporation owned by appellant.

of the foregoing items except the lost match books.

The motion was denied, except as to the photograph, the court finding that the investigators "were admitted to the premises by the owner, Mr. Chaconas", and that he "affirmatively assented to their taking of this property." The court suppressed the background of the photograph and the part showing the intact match book. The remainder of the picture, in which only the burnt match book and cover were visible, was not suppressed.

The defendant had testified before the grand jury, and the court ruled that any portion of his testimony that was material would be admissible in the government's case in chief, finding that no threats had been made against him nor were any promises made to him, that his rights were properly explained to him and that his testimony was given voluntarily. Appellant's objection thereto is not pursued on this appeal.

In considering appellant's motion to suppress, we first note that 7 D.C.R.R. 1.10 (known as the Fire Prevention Code) provides that: "The Fire Chief shall investigate the cause, origin and circumstances of every fire . . . which in his judgment is of a suspicious nature, . . . or by which property has been destroyed or substantially damaged. . . ."

7 D.C.R.R. 1.4 provides that "The Fire Chief may, at all reasonable hours enter any building or premises for the purpose of making any inspection or investigation which, under the provisions of this Code, he may deem necessary to be made."

Appellant complains that the inspectors investigating the fire did not have a warrant to search, citing See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d

943 (1967). That case held that despite a Seattle city ordinance[3] granting firemen authority to inspect · buildings, a suitable warrant procedure was required by the Fourth Amendment to permit a representative of the city's fire department to make a routine inspection of a locked warehouse where there was no showing of probable cause to believe that a violation of some ordinance existed therein.

Whatever the application of that decision may be to routine inspections by public service employees, we note that in a companion case decided the same day the Supreme Court said

nothing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations. See North American Cold Storage Co. v. City of Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (seizure of unwholesome food); Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (compulsory smallpox vaccination); Compagnie Francaise v. Board of Health, 186 U.S. 380, 22 S.Ct. 811, 46 L. Ed. 1209 (health quarantine); Kroplin v. Truax, 119 Ohio St. 610, 165 N.E. 498 (summary destruction of tubercular cattle) . . . . [Camara v. Municipal Court, 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967).][4]

Of more importance here, the Court also observed that "it seems likely that warrants should normally be sought only after entry is refused. . . ."

In the case before us, of course, entry was not refused. The testimony was that the two inspectors were let into the premises voluntarily by the appellant at their request. Appellant was present during the investigation consenting to the removal of certain evidence and the trial court made

3. *Cf.* Colonnade Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), where the Court seemed to apply a different rule to a Treasury Department inspection involving the "liquor industry" to wit—a catering establishment.

4. A panel of the Michigan Court of Appeals has rejected the application of *Camara* to arson investigations. People v. Tyler, 50 Mich.App. 414, 213 N.W.2d 221, 223 (1973).

corresponding findings of fact on this testimony.

In Schneckloth v. Bustamonte, 412 U.S. 218, 248–249, 93 S.Ct. 2041, 2059, 36 L.Ed. 2d 854 (1973), the Supreme Court said:

> We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge.
>
> . . .

The facts here, as found by the trial court, bring this case within the purview of that rule and since there is ample evidence in the record to support the findings on the motion to suppress, the court's ruling on that motion is affirmed.

In considering appellant's motion for judgment of acquittal at the end of the government's case in chief, the trial court had before it all of the prosecution's evidence except for one stipulation and one rebuttal witness, whose testimony dealt largely with appellant's father being unable to produce a passenger manifest that might have elucidated his testimony reflecting his taxicab business on the night of the fire.

The court made oral findings, which were supported by the evidence, and denied the motion. We agree with that ruling basically for the same reasons that bring us to the conclusion that the evidence in the case was sufficient to support the verdict. On the latter motion the court made detailed written findings with well reasoned conclusions which we examine in light of the evidence adduced.

The thrust of the argument of appellant's counsel on the insufficiency of the evidence was that there was no direct evidence to connect appellant with the gasoline or with the igniting of the fire.[5]

The findings of the trial court, insofar as they relate to that contention, may be summarized as follows. The two investigators of the cause of the fire found traces of gasoline in an electrical junction box which was located in a burned area of the upstairs floor. The burned pattern on the upstairs interior showed that the fire was aided by an accelerant like gasoline. The first investigator, who had arrived at the scene of the fire shortly after it was extinguished, found evidence of a cigarette match bomb in a previously existing hole in the upstairs floor under a bench seat against the west wall of the room. This was immediately below the "coning effect" burn. The court found that the cigarette match bomb ignited fumes from gasoline which had been spread on and above the bench, across the rug and the floor, on benches along the east wall and over the tops of tables. The fire spread from the west wall across the rug burning around the electrical box in the floor where some gasoline had collected to the east wall.

The court also found that the defendant had participated in the remodeling of the upstairs of the restaurant and was familiar with its physical layout and characteristics. On the occasion of the fire the first floor rear door was boarded shut. Entry was impossible through any rear window. The upstairs rear door was locked from the inside and both front doors were locked with dead bolts when the firemen arrived. The second floor skylight was intact until broken by firemen. The right front door which led to the stairs to the second floor had no outside handle, making it very difficult to open from the outside and "made a lot of grating sounds" when opened. The bartender heard no such noise while cleaning up shortly before the fire. An air

---

5. Appellant also questions the sufficiency of the evidence in other respects. We find no merit in those contentions.

conditioner located in a hole cut through the second floor west wall was in place when the firemen arrived. It did not slide easily and was removed by the firemen only after some struggle.

Shortly before 1:30 a. m. the appellant closed the restaurant and offered the bartender a ride home as he occasionally had done in the past. The bartender refused because he had to clean up. He saw the appellant go out the front door at about 1:30 a. m. and saw him return at about 1:45 or 1:50 a. m. The bartender accepted his renewed offer of a ride and they locked up the restaurant between 1:50 and 1:55 a. m.

At about 10 p. m. of the evening before the fire, appellant had unlocked the upstairs rear door with a key in the course of a search for the source of a burning odor which also prompted him to shut off the heater on the first floor.

Almost every night for several years, Costa Chaconas, the defendant's father, had come to the restaurant at least once between 10 p. m. and 2 a. m. to take the defendant to some nearby restaurant. However, on the night of February 23rd the bartender did not see Costa Chaconas enter the restaurant nor did the defendant make any mention of his father to the bartender at any time that evening. The court also found that defendant's father did not appear at the restaurant nor see the defendant at any time between 1:30 a. m. and 2 a. m. of February 24, 1971.

Inasmuch as the defendant's father in testifying for the defense had said that he had been with his son at a White Tower restaurant not far from the Tom Jones between 1:30 and 1:50 a. m., and that afterwards he proceeded to make his routine 2 a. m. pick up of a group of regular passengers to take them to their homes, the trial court made observations thereon in a footnote to the findings which in essence were as follows: The defendant's father failed to produce his passenger manifest when requested to do so and admitted on the witness stand that he had lied previously when he told his superior that he did have a passenger manifest of his taxi fares for that month. The court found that the defendant's testimony before the grand jury, that he had assisted the bartender in cleaning up the restaurant between 1:30 and 1:50 a. m., was in complete conflict with the bartender's "credible testimony" that the defendant had left the restaurant for about 20 minutes during that period. The defendant's testimony was also completely at variance with the trial testimony of defendant's father that his son was with him at the White Tower during that critical period. The court concluded that the testimony of the defendant's father "is simply not believable".

The court also found that the defendant's Class C liquor license had been suspended by the District of Columbia ABC Board for a 45-day period preceding February 18, 1971. The majority of the restaurant's business was made up of sales of beer and the restaurant had a poor credit status with its principal beer suppliers, being able to buy from them only on a C. O.D. basis although neither the bank account of the restaurant nor defendant's personal bank account reflected any financial distress.

The defendant, t/a Tom Jones Restaurant, Inc., was insured up to $40,000 on furniture, fixtures and improvements and betterments usual to a restaurant. A $712 premium carried the insurance for a one year term. It would have expired at 12:01 p. m. on February 25, 1971, one day after the fire. An expiration notice had been sent to the defendant on January 15, 1971, but an application for continuance of the policy was not made before the fire occurred. Notice of fire loss at the restaurant was filed on February 24, 1971.

As to count one, arson, the trial court noted that the elements are the malicious burning by the defendant of a building belonging to another. It found that the fire "was definitely an arson". It made necessary observations as to ownership of the property and defendant's tenancy and concluded that the totality of the circumstances established beyond a reasonable doubt that the defendant set fire to the premises in question.

As to count two, the malicious burning of one's own property with the specific intent to defraud or injure another, the trial court concluded in its opinion that there was "ample circumstantial evidence upon which to conclude beyond a reasonable doubt that the defendant not only set the fire but had done so with the specific intent to defraud the Aetna Insurance Company."[6]

In a well reasoned opinion accompanying the findings and conclusions, the court dealt with the evidence in detail relating it to the elements of each of the two offenses. The court placed considerable emphasis on the unusual yet strategic placement of the cigarette match bomb in a hole in the floor under a bench along the west wall, which it felt to be quite significant in view of defendant's familiarity with the physical layout of the second floor. It pointed out that defendant was absent from the premises while the bartender was cleaning up and that the testimony of the firemen unequivocally established that there was no ready access for them when they arrived at the scene, everything being locked, bolted or boarded shut, and the upstairs door being locked from the inside. It also noted that defendant had greater means of access to the premises than was available to anyone else.

With further reference to the identity of the arsonist, the court said in its opinion that the evidence did not substantiate defendant's claim that someone other than the defendant had an opportunity to start the fire. It concluded its opinion by stating:

On the basis of the preceding discussion, the legal accuracy of which both parties here concede, this Court concludes that the totality of the evidence in this case, together with reasonable inferences to be drawn therefrom, establishes beyond a reasonable doubt that defendant did maliciously set fire to and burn the upstairs room at Tom Jones. The possibility that some unknown person, with an accurate knowledge of the second floor geography, either entered with a key just after defendant and Gleeson left or just happened to come in during defendant's brief absence before locking up and awaited their departure before setting the blaze, is too speculative a hypothesis to be accorded that status of a reasonable doubt.

The bulk of the testimony of the defendant's witnesses was that the defendant was of good character and reputation and did not appear to be in dire financial straits.

■ The government's case, on certain crucial points, admittedly is founded on circumstantial evidence. However, the fact that the case may rest on circumstantial evidence is of little consequence if the evidence is such that it may reasonably convince the trier of fact beyond a reasonable doubt. United States v. Harris, 140 U.S.App.D.C. 270, 286, 435 F.2d 74, 90 (1970), *citing* Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954). In considering the sufficiency of the evidence, we must view the evidence in the light most favorable to the government's position. Crawford v. United

6. *See* People v. Angelopoulos, 30 Cal.App.2d 538, 543, 86 P.2d 873, 878 (Dist.Ct.App.1939).

States, 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967); Curley v. United States, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

We agree with the trial court that the government must "introduce sufficient evidence to sustain a conviction and" that "it must be sufficient to persuade a jury to reach a verdict of guilty beyond a reasonable doubt, but it does not have to compel such a verdict."

We have said previously that "the government is not required to negate every possible inference of innocence before an accused can be found guilty of an offense beyond a reasonable doubt". In re T. J. W., D.C.App., 294 A.2d 174, 176 (1972) (citation omitted).

■ In the *Crawford* opinion, *supra* 126 U.S.App.D.C. at 158, 375 F.2d at 334, Judge Burger (now Chief Justice) observed:

In the *Curley* opinion we said that in deciding whether to submit a case to the jury the trial judge must consider whether reasonable jurymen must necessarily have a reasonable doubt or whether, on the other hand, the evidence was such that a reasonable mind might fairly have a reasonable doubt *or might not* have such doubt. . . . (Emphasis in original.)

The same standard is applied in ruling on a motion for acquittal at the end of the entire case. United States v. Lumpkin, 145 U.S.App.D.C. 162, 168, 448 F.2d 1085, 1091 (1971).

■ We hold that there is substantial evidence to support the court's findings of fact which in turn are ample support for the conclusions derived therefrom. The judgment accordingly is

Affirmed.